UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| GORDON FITZPATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 8-400-B-W |
| | ) | |
| TELEFLEX, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION**

Gordon Fitzpatrick, a distributor of a unique type of truck heat/cooling component manufactured by the defendants, claims the defendants wrongfully terminated his distributorship. Fitzpatrick has brought a seven-count complaint. Defendants moved to dismiss all seven counts of the complaint pursuant to Fed. R. Civ. P. 12(b)(6.) I now recommend that the Court grant the motion in part and dismiss counts three, five, and seven, the counts alleging breach of the implied duty of good faith and fair dealing, fraud, and recoupment. I further recommend that the Court deny the motion as to the remaining claims.

**Material Allegations of the Complaint**

Teleflex is a multinational corporation engaged in manufacturing and selling many products, including the "ProHeat" line of mobile auxiliary power units intended to be used as a power source for heating and air conditioning truck cabs as well as for the operation of onboard appliances. The purpose of these devices is to avoid engine idling and thereby conserve fuel and achieve compliance with anti-idling governmental regulations without sacrificing driver comfort. (Compl. ¶ 1.) Teleflex operates this

business though a division that includes Teleflex-Canada, a wholly owned subsidiary. (Id. ¶ 2.) The Plaintiff alleges that Teleflex and Teleflex-Canada (hereinafter identified as Teleflex) have been wholly integrated and operated in a fashion that blurs their boundaries as separate and distinct legal entities. (Id. ¶ 3.)

Teleflex began the ProHeat line of business and the development of truck cab and bus heaters in 1990. (Id. ¶ 4.) In 2000 they acquired an auxiliary power unit business from a separate Canadian company in order to take advantage of new growth opportunities. (Id. ¶ 5.) These auxiliary power units are used as a power source when vehicles are stationary in order to reduce fuel consumption and engine maintenance. (Id. ¶ 6.) In 2000, at the inception of the ProHeat business, the products were relatively new, entry level products in the earliest stages of development. Teleflex employed engineers and product designers to develop a competitively priced, durable, state of the art auxiliary power unit that could be easily installed on trucks and buses by independent mechanics. (Id. ¶ 7.) The units were sold under the name ProHeat. (Id. ¶ 8.) By 2006 the ProHeat unit was in its fourth generation. During the period from 2000 to 2006 Teleflex encouraged ProHeat distributors to develop ideas, methods, and techniques for the design, manufacture, installation, operation, maintenance, and service of ProHeat equipment. (Id. ¶ 9.) By 2006 Teleflex's product line had made it a leader in the industry. (Id. ¶ 10.)

Teleflex initially had no effective marketing and distribution system for the ProHeat. Therefore, beginning in 2000, Teleflex had to build a national distribution system through which to sell and service the ProHeat line of products. (Id. ¶ 11.) Fitzpatrick alleges that Teleflex's business plan was to act as quickly as possible to build

a distribution network by signing-up local truck repair businesses to become ProHeat

dealers who would sell, install and service the units.  Teleflex made an oral promise to

these businesses of a long term dealer relationship as a member of the "Teleflex Family."

(Id. ¶ 12.)  Fitzpatrick contends that Teleflex planned to use these local truck repair

businesses as an interim arrangement to get their business up and running in order to

attract a sophisticated national marketing organization "that could take the sales of the

product to its market potential."  (Id. ¶ 13.)  Scott Winton was the individual assigned by

Teleflex to the development of this start-up distribution system for the auxiliary power

units and climate control equipment.  (Id. ¶ 14.)   Winton's charge was to locate and

solicit distributorship agreements without disclosing the temporary nature of the

arrangement and to do so on the basis of oral agreements that would provide optimum

flexibility for the replacement of the temporary dealers as soon as circumstances

permitted.  (Id. ¶ 15.)

In 2000, Houlton, Maine, was the center of an active trucking industry serving

logging, industrial, and agricultural interests in northern Maine.  (Id. ¶ 16.)  Gordon

Fitzpatrick operated a well-known truck repair facility in Houlton for a number of years

prior to 2000.  (Id. ¶ 17.)   In November-December 2000, Winton invited Fitzpatrick to

become a distributor for the ProHeat products and Fitzpatrick decided to do so on the

terms offered.  (Id. ¶ 18.)  On December 20, 2000, Fitzpatrick was designated as a

member of the "Teleflex family" and a "ProHeat Center of Excellence" in a written letter

confirming the appointment of Gordy's Repair Shop that was signed by Scott Winton.

(Id. ¶¶ 19 & 20; see also Compl. Ex. A, Doc. 1-3.)  As a result of the December 20 letter

Fitzpatrick was appointed the exclusive authorized distributor in the State of Maine for the ProHeat line of products. (Id. ¶ 21.)

The terms of the oral distributorship agreement were negotiated and agreed upon by Fitzpatrick and Winton. (Id. ¶ 22.) Prior to 2000 Fitzpatrick had no significant experience as a distributor or in the negotiation of distributorship agreements. (Id. ¶ 23.) Fitzpatrick was not represented by an attorney in connection with the distributorship agreement. (Id. ¶ 24.) The terms of the oral agreement were that Fitzpatrick would be the distributor for the complete line of ProHeat products as they currently existed and as they might be developed and expanded over time. He was entitled to use the "Teleflex" and "ProHeat" trade names and trademarks in the conduct of his business. Fitzpatrick was the exclusive dealer in the State of Maine. The agreement could be terminated by Teleflex only in good faith with prior notice and with good cause shown. Fitzpatrick was authorized to employ sub-dealers at his sole discretion in order to achieve market penetration. Fitzpatrick was an independent contractor and retained exclusive control over his business operations. Teleflex agreed to actively advertise and promote Fitzpatrick as its exclusive distributor in the State of Maine. Teleflex would provide all reasonably necessary information and support for the sale and servicing of the ProHeat products. Fitzpatrick was entitled to payment from Teleflex for any work done to resolve product failures under Teleflex's warranty program. (Id. ¶ 25 (a-g).) After December 20, 2000, Teleflex provided Fitzpatrick with promotional materials, warranty program information, and product manuals along with technical advisory letters to assist in selling and servicing the products. (Id. ¶ 26.) From 2000 up until the date of the commencement of this lawsuit Teleflex regularly advertised that Fitzpatrick's shop was its exclusive

distributor in the State of Maine.  (Id. ¶ 27.)  Teleflex knew and expected that Fitzpatrick would invest time and money in the development of a market for the ProHeat products within his exclusive dealership territory.  (Id. ¶ 28.)  After December 20, 2000, Fitzpatrick, with Teleflex's encouragement, became a source of information about useful improvements that could be made to the ProHeat auxiliary power units.  (Id. ¶ 29.)

From December 20, 2000, forward Fitzpatrick invested time and resources to develop a market for the ProHeat products within the State of Maine.  (Id. ¶ 31.)  Fitzpatrick communicated to Teleflex the names of purchasers, customers, and potential customers.  (Id. ¶ 32.)   Fitzpatrick developed servicing techniques and methods that improved the performance and reliability of the ProHeat products.  (Id. ¶ 33.)  Fitzpatrick's specific contributions included improvements in performance, installation techniques, plumbing design, the use of modular components, and recommendations regarding access to the top enclosure, relocation of hose and wire connections, improvements to air flow and cooling capacity, relocation of the generator circuit breaker for ease of access, re-routing of fuel runs, change in engine water drain fitting, improvement of the operator controls, and noise reduction.  (Id. ¶ 34.)  Teleflex received and adopted Fitzpatrick's recommendations.  (Id. ¶ 35.)  Teleflex received a substantial benefit from Fitzpatrick.  (Id. ¶ 36.)  In mid-2005 Teleflex introduced its new and improved Generation Four ProHeat system which incorporated suggestions and recommendations made by Fitzpatrick.  (Id. ¶ 37.)

On March 1, 2006, Teleflex entered into an agreement with Carrier Corp., appointing them as the exclusive distributor of the ProHeat product line.  (Id. ¶ 39.)  Teleflex entered into this agreement in order to take advantage of Carrier's developed

distribution systems throughout North America and to benefit from shared marketing with Carrier's Transicold product line of freezers and coolers for trucks. (Id. ¶ 41.) The association with Carrier provided Teleflex with instantaneous access to worldwide markets and a highly skilled sales and distribution network. (Id. ¶ 42.) As part of this Carrier/Teleflex agreement the ProHeat line of products was renamed ComfortPro and all marketing activities were conducted under that new name. (Id. ¶ 43.)

On June 13, 2006, Teleflex sent Fitzpatrick a written notice of termination of all agreements relating to the purchase, supply, sales, servicing and/or distribution of auxiliary power units and demanded that Fitzpatrick relinquish all confidential business information in his possession. (Id, ¶¶ 44-45, Document No. 1-4, Ex. B.) Teleflex's termination of the distribution agreement was without cause and was effected only to implement the appointment of Carrier as the worldwide exclusive distributor. (Id. ¶ 46.) Carrier proceeded to appoint Bangor Truck and Repair as the exclusive Maine distributor for the ComfortPro line of products. (Id. ¶ 47.) Notwithstanding the unilateral termination of the distribution agreement between Teleflex and Fitzpatrick, Teleflex has continued without Fitzpatrick's permission to list him in its product brochures as the exclusive Maine dealer of ProHeat products in an attempt to retain for Teleflex's benefit the good will and reputation built by Fitzpatrick in the State of Maine. (Id. ¶ 48.)

Fitzpatrick alleges that the December 20, 2000, distribution agreement was governed by the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361 *et seq.* (Id. ¶ 55.) Fitzpatrick submitted a written demand for relief under the Unfair Trade Practices Act, as required under Maine law. 5 M.R.S. § 213(1-A.) (Id. ¶ 60.)

**Discussion**

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint. A motion to dismiss is "not an occasion to prove or disprove the facts in the Complaint. Rather, the Court assumes that all facts alleged in the Complaint are true and makes all reasonable inferences from those facts in Plaintiff's favor." Greenier v. PACE, Local No. 1188, 201 F. Supp. 2d 172, 176 (D. Me. 2001).

The seven counts set forth in the complaint are as follows:  (I) breach of contract; (II) unfair trade practices, arising because of a claimed violation of Maine franchise law; (III) breach of the implied duty of good faith and fair dealing;  (IV) breach of fiduciary duty;  (V) fraud;  (VI) unjust enrichment;  and (VII) "recoupment."  Teleflex challenges every count.

### A.     Count I—Breach of Contract

Fitzpatrick alleges the existence of an oral distribution agreement commencing on December 20, 2000, with a for-cause restriction on Teleflex's ability to terminate the relationship.  (Compl. ¶¶ 50-52.)  Teleflex maintains that Maine's Statute of Frauds bars Fitzpatrick's contract action because Fitzpatrick seeks to enforce an oral contract of greater than one year's duration.  I conclude that the Statute of Frauds is likely inapplicable here, because the duration of this contract is allegedly set by a "for cause" restriction on termination that is prescribed by a Maine statute that extends its protection to oral franchise agreements of indefinite duration.  Alternatively, even if the Statute of Frauds does apply, it does not bar the action given the existence of a signed memorandum of the parties' agreement.[1]

---

[1]     I have proceeded with an analysis of the Maine Statute of Frauds provision governing contracts not to be performed in one year because the complaint makes no reference to the UCC, which has its own

Under Maine law, "no action shall be maintained . . . [u]pon any agreement that is not to be performed within one year from the making thereof . . . unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized[.]" 33 M.R.S. § 51(5).  Whether the plaintiff is attempting to enforce an unwritten agreement not to be performed within one year from its creation is a factual question to be decided based on the overall circumstances that tend to suggest the parties' actual intent.  It has been said that "if the parties plainly manifested an intent that the contract was not to be performed within one year, the contract falls within the statute of frauds set forth at 33 M.R.S. § 51. Roger Edwards, LLC v. Fiddes & Son, Ltd., 245 F. Supp. 2d 251, 258 (D. Me. 2003) (citing Great Hill Fill & Gravel, Inc. v. Shapleigh, 1997 ME 75, 692 A.2d 928, 929-30); Marshall v. Lowd, 147 A.2d 667, 672 (Me. 1958)).

In this case we are dealing with a distributorship agreement of indefinite duration rather than an agreement calling for continued performance over a definite duration in excess of one year.  Because we are at the pleadings stage with the pending motion to dismiss, there is no evidence presently in the record of the parties' respective intentions

---

statute of frauds provision.  Likewise, Teleflex's Rule 12(b)(6) motion is not tethered to the UCC statute of frauds.  Moreover, the nature of the breach is that Teleflex allegedly terminated the relationship unilaterally, without good cause, and the alleged good cause provision appears to arise by operation of the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. § 1363(3)(B), (C).  Finally, there is no evidence that the parties ever structured or characterized their agreement as a contract for the sale of goods.  See Roger Edwards, LLC v. Fiddes & Son, Ltd., 245 F. Supp. 2d 251, 258-60 (D. Me. 2003) (declining to apply the UCC for want of evidence of a contract for sale of goods); Me. Surgical Supply Co. v. Intermedics Orthopedics, Inc., 756 F. Supp. 597, 601-602 (D. Me. 1991) (declining to apply UCC statute of frauds provision at summary judgment where record raised a genuine issue whether a contract for sale of goods existed or a contract for the provision of services).

I note, however, that some courts have found that a distributorship agreement is automatically subject to the UCC.  See Mass Cash Register, Inc. v. Comtreax Systems Corp., 901 F. Supp. 404, 418-19 (D. Mass. 1995) (collecting cases and suggesting a majority of courts have concluded that the statute of frauds found in the UCC is applicable to distributorship agreements as these hybrid agreements are predominantly for the sale of goods.)

8

concerning contract duration.  It is alleged, of course, that the relationship lasted nearly 6 years.  However, when it comes to what might plausibly be proved, it is as plausible that the contractual relationship was governed by a series of one-year agreements as it is that it was governed by a multi-year term.  But more to the point, the one thing about this case that appears to generate the statute of frauds defense is that Fitzpatrick alleges the existence of a "for cause" termination provision.  Thus, unlike indefinite "at will" relationships, which fall outside of the statute of frauds, Burnell v. Town of Kingfield, 686 A.2d 1072, 1074 (Me. 1996), the plaintiff here is maintaining that the defendant was required to continue in the contractual relationship until such time as it could identify good cause for terminating it.  The defendant, on the other hand, insists that the relationship was an "at will" one, which, if true, would make the statute of fraud question irrelevant.  I conclude, for reasons that follow, that the plaintiff's allegation that there is a for cause restriction on the defendant's ability to terminate does not require that the breach of contract claim be treated as a contract not to be performed within one year.

Even in the absence of any agreement between the parties on the "for cause" versus "at will" question, Fitzpatrick separately alleges in his unfair trade practices claim that the Maine Franchise Laws for Power Equipment, Machinery and Appliances (MFLPE) independently prescribes such a contract provision.  (Compl. ¶¶ 55-56.) Teleflex has not argued that the MFLPE does not apply.  Assuming that the MFLPE does apply here, then that law does, indeed, make it unlawful for the party in Teleflex's position to terminate the relationship in the absence of good cause.  10 M.R.S. § 1363(3)(B), (C).  Moreover, the MFLPE specifically provides that distributorship agreements coming under it may be for terms of indefinite length.  Id. § 1361(3)

(defining "franchise" to mean "an oral or written arrangement for a definite or indefinite period pursuant to which a manufacturer grants to a dealer or distributor of goods a license to use a trade name, trademark, service mark or related characteristic and in which there is a community of interest in the marketing of goods and related services . . ."). Where the contract in question has no durational term whatsoever and the statute of frauds question arises out of a contest over whether the contractual relationship is governed by a "for cause" or "at will" termination term, then in the context of a distributorship subject to the MFLPE, the statute of frauds has no effect. After all, it matters not whether the parties "plainly manifested the intent that the contract was not to be performed within one year,"[2] Roger Edwards, LLC v. Fiddes & Son, Ltd., 245 F. Supp. 2d 251, 258 (D. Me. 2003), because Maine law specifically provides that distributorship agreements coming under the Act may be for terms of indefinite length and that it is unlawful for the manufacturer to cancel or terminate the relationship in the absence of good cause. In my view, Teleflex's reliance on Maine's Statute of Frauds is therefore misplaced.[3]

In the alternative, even if a traditional Statute of Frauds analysis is called for in this case, I conclude, as did the court in the Roger Edwards case, that the series of writings available in this case collectively satisfy the requirements of the Statute of

---

[2] This particular circumstance likely could not arise but for the MFLPE. For example, in the employment context, Maine law would require a clear statement of any "for cause" restriction on the employer's right to terminate the relationship, quite apart from any statute of frauds question. Larrabee v. Penobscot Frozen Foods, 486 A.2d 97, 99-100 (Me. 1984). Otherwise, "a contract of employment for an *indefinite* length of time is terminable at will by either party" as a matter of law. Terrio v. Millinocket Community Hosp., 379 A.2d 135, 137 (Me. 1977) (emphasis in original). Thus, either there would be an express "for cause" provision that would satisfy the Statute of Frauds, or else the relationship would be treated as "at will," which would circumvent the "not to be performed within one year" provision of the Statute of Frauds.

[3] This case is distinguishable from Roger Edwards, LLC v. Fiddes & Son, Ltd. precisely because the distributorship agreement at issue in that case was not subject to the MFLPE.

Frauds.  "The Statute of Frauds bars enforcement of certain contracts 'unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized. . . .'"  Wilson v. DelPapa, 634 A.2d 1252, 1254 (Me. 1993).  "The purpose of the statute of frauds is to prevent actions based on false claims." Brown Dev. Corp. v. Hemond, 2008 ME 146, ¶ 11, 956 A.2d 104, 108.

> [A] contract within the Statue of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which . . . is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party.

Wilson, 634 A.2d at 1254 (quoting Restatement (Second) of Contracts § 131 (1981)). "[A]lmost any writing is sufficient for statute of frauds purposes."  Brown Dev. Corp., 2008 ME 146, ¶ 12, 956 A.2d at 108.

In this case there are two writings attached to the complaint that acknowledge that the contract in question was entered into by the parties.  Both are signed by individuals who presumably had the authority to bind Teleflex with respect to its entry into the agreement with Fitzpatrick (the Dec. 20, 2000, "congratulations and welcome to the Teleflex family" letter) and with respect to its cessation of the agreement (the June 13, 2006, "Termination of Distribution Relationship" letter).  (Compl. Exs. A, B.)  Given the existence of these documents, it cannot seriously be said that the enforcement of the alleged contract would consummate a fraud.

**B.     Count II—Unfair Trade Practices**

According to Teleflex, this count of the complaint should be dismissed because Fitzpatrick has failed to allege a "community of interest" as required by Maine law[4] and

---

[4]     Fitzpatrick characterizes Teleflex's argument thusly:

11

because the claim is barred by the statute of limitations. Pursuant to the MFLPE, a franchise "means an oral or written arrangement for a definite or indefinite period pursuant to which a manufacturer grants to a dealer or distributor of goods a license to use a trade name, trademark, service mark or related characteristic and in which there is a *community of interest* in the marketing of goods and related services at wholesale, retail, by leasing or otherwise." 10 M.R.S. § 1361(3) (emphasis added.) The MFLPE does not define "community of interest" and there are no Maine cases on point. However, the Seventh Circuit and the Wisconsin Supreme Court have discussed the "community of interest" provision found in a Wisconsin statute. See Praejke Auto Elec. and Bakery Co. v. Tecimseh Prods. Co., 255 F.3d 460, 464-465 (7th Cir. 2001) (finding in the context of a preliminary injunction that there was insufficient evidence to establish that the dealer had ever made a significant brand-specific investment in the manufacturer's products);

---

> In its defense to Count II of the Complaint, Teleflex contends that there was no contractual relationship rising to the level of a distributorship or a dealership, and the relationship was simply a requirements contract for the sale of goods to Mr. Fitzpatrick for resale to end-users. *See* Teleflex's Objection at pages 9-12. A requirements contract does fall within the UCC. If the purchaser has made an investment in the absence of a contract in the business based on the purchase of product for resale, the manufacturer's termination of the supply of product has been viewed as a breach of the duty of good faith and fair dealing. See, e.g., Loos &. Dilworth v. Quaker State Oil Ref Corp., 500 A. 2d 1155 (Pa. Super. 1985; Enfield Equipment Co. Inc. v. John Deere Co., 2000 U.S. App. LEXIS 17424 *7 (4th Cir. 2000); Taylor Equipment v. John Deere Co. 98 F. 3d 1028 (8th Cir. 1996); Healy v. Carlson Travel Network Assoc,. 227 F. Supp. 2d 1080 (D. Minn. 2002); Shibata v. Lim, 133 F. Supp. 2d 1311 (M.D. Fla. 2000); James v. Whirlpool Corp., 806 F. Supp. 835 (E.D. Mo. 1992); Sons of Thunder v. Borden, Inc., 690 A.2d 575 (N.J. 1997); Lum Corp. of America v. Alcoa Bldg. Prods., 351 A. 2d 349 (N.J. 1976). An action for breach of the implied duty of good faith is sometimes referred to as a "gap filler." See Healy, supra.

(Resp. in Opp., (Doc. No. 11) at pp 12-13). I mention this argument because it seems to suggest that Fitzpatrick is arguing, for purposes of Count III (the breach of the implied duty of good faith), that the UCC is applicable to his complaint. Throughout the remainder of his memorandum, and particularly when discussing the Statute of Frauds issues raised under Count II, he disavows applicability of the UCC. As discussed more fully below, I construe Count III of the complaint as alleging a breach of a common law contractual duty of good faith and fair dealing, a cause of action not recognized under Maine law.

Ziegler Co. v. Rexnord, Inc., 407 N.W.2d 873, 882 (Wis. 1987) (remanding case at summary judgment stage because "this court cannot resolve, as a matter of law, the question whether the community of interest requirement has been met").  While the cases suggest that under Wisconsin law a purported dealer must prove something more than retail sales of the products of a specific manufacturer over a period of time, neither case discussed a pleading standard involving the "community of interest" allegation.

This portion of Teleflex's motion rises and falls on this Court's application of the Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), pleading standard.  In Twombly the United States Supreme Court explained: "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,'  in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" 127 S. Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957).  Furthermore:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

Id. at 1964-65 (footnote and some citations omitted.)  "In applying these general standards to a § 1 [Sherman Act] claim," the Supreme Court held "that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer an agreement does not

13

impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 1965 (footnote omitted, emphasis added.)

Notwithstanding Teleflex's complaints about Fitzpatrick failing to specifically allege what percentage of his business was exclusively devoted to ProHeat and other claimed pleading deficiencies, Fitzpatrick has pled sufficient facts to support plausible grounds to infer a "community of interest" between him and Teleflex, even assuming the application of the Wisconsin definition of the term. Whether Fitzpatrick can ultimately prove a community of interest between himself and Teleflex sufficient to satisfy the requirements of the MFLPE is entirely a separate question.

Teleflex also argues this count should be dismissed because it is barred by the statute of limitations. According to Teleflex the complaint in this action was filed on September 9, 2008, in the Superior Court in Houlton, Aroostook County, Maine.[5] An action arising out of the MFLPE "must be commenced within 2 years after the cause of action accrues." 10 M.R.S. § 1369. According to Fitzpatrick, he received a written notice of termination on June 13, 2006, indicating that the termination would be effective 90 days hence, on the "Termination Date." Both sides agree that a cause of action in contract accrues "at the time judicially cognizable injury is sustained." Estate of Miller, 2008 ME 176, ¶ 25, 960 A.2d 1140, 1146; Gile v. Albert, 2008 ME 58, ¶ 8, 943 A.2d 599, 601 ("In a breach of contract claim, that date occurs when the defendant breaches

---

[5] This court entered a procedural order on November 21, 2008, directing Teleflex to file a duplicate record of the state court docket and an affidavit of counsel. My review of the docket does not reflect that any such documents were filed. However, there does not seem to be any dispute but that the complaint was filed September 9, 2008. It bears that date, but there is no date stamp indicating that it was received by the court on that date. Nor is there a copy of the state court docket sheet contained within this record that I can find. I will accept on faith that the complaint was filed in state court on September 9, 2008.

14

the contract.") Assuming an enforceable distributorship agreement ever existed between the parties, it seems apparent to me that the contract was breached when Teleflex unilaterally terminated it, i.e., on the "Termination Date." I thus conclude that the complaint was timely filed because it is undisputed that it was filed within two years of that date. The motion to dismiss as to Count II should be denied.

**C.      Count III—Breach of the Implied Duty of Good Faith and Fair Dealing**

Maine law does not recognize an implied duty of good faith and fair dealing in the common law of contracts. See Niedojadlo v. Central Me. Moving & Storage Co., 1998 ME 199, ¶¶ 7-10 & nn.1-3, 715 A.2d 934, 936-37 (citing First NH Banks Granite State v. Scarborough, 615 A.2d 248, 250 (Me. 1992) (declining to extend duty of good faith and fair dealing where the UCC is inapplicable); Cashman v. Portland Pipe Line Corp., 559 F. Supp. 2d 85, 109 (D. Me. 2008). This implied duty is statutorily imposed by the Uniform Commercial Code ("UCC") only on contracts within its scope. Diversified Foods, Inc. v. First Nat'l Bank of Boston, 605 A.2d 609, 614 (Me. 1992.) The UCC applies to transactions concerning the sale of goods and not services. 11 M.R.S.A. § 2-102. In his complaint Fitzpatrick nowhere alleges that his claims are in any way governed by the UCC. Accordingly, this count should be dismissed because it fails to state a claim under Maine law.

**D.      Count IV—Breach of a Fiduciary Duty**

"A complaint alleging breach of a fiduciary duty 'is required to set out specific facts regarding the nature of the relationship alleged to have given rise to a fiduciary duty in order to determine whether a duty may exist at law.'" Innovative Network Solutions, Inc. v. Onestar, 283 F. Supp. 2d 295, 303 (D. Me. 2003) (quoting KeyBank Nat'l Ass'n v.

15

Sargent, 758 A.2d 528, 536 (Me. 2000).  Under Maine law, in order to establish a fiduciary relationship there must be: "(1) the actual placing of trust or confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." Id. (quoting Stewart v. Machias Sav. Bank, 2000 ME 207, ¶ 10, 762 A.2d 44, 46).

Viewing the allegations in the light most favorable to Fitzpatrick, particularly as stated in ¶¶ 71-79 of the complaint, I am forced to conclude that Fitzpatrick has stated a claim for relief under Count IV of the complaint.  It is apparent to me that under Maine law the mere existence of a franchisee-franchisor relationship does not establish a fiduciary relationship.  However, my role when deciding a Rule 12(b)(6) motion to dismiss is not to make a determination about the probability of success on the merits.  In my view Count IV should not be dismissed at this juncture because the above-referenced paragraphs contain allegations that could plausibly support a claim for breach of a fiduciary duty.

### E.    Count V—Fraud

Under Maine law fraud consists of (1) the making of a false representation; (2) of a material fact; (3) with knowledge or reckless disregard of its falsity; (4) for the purpose of inducing reliance; and (5) where the plaintiff justifiably relies to his detriment. Goodman v. President & Trs. of Bowdoin Coll., 135 F. Supp. 2d 40, 59 (D. Me. 2001). Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud must plead with particularity the circumstances constituting fraud.  This special pleading requirement applies to state law claims filed in federal court.  Id.  To meet the particularity requirement of the rule, a plaintiff must specify the "time, place, and content of an

alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." Id. (citing Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985)).

Fitzpatrick alleges that the letter of December 20, 2000, contained a false representation that there would be a long term relationship between him and Teleflex that could only be terminated for good cause. (Compl. ¶ 83.) He also alleges that he "regularly received correspondence" from Teleflex after December 20, 2000, supporting and confirming the expected long term relationship. (Id. ¶ 84.) Fitzpatrick does not specify the time, the place, or the content of that ongoing correspondence. His complaint does describe in detail a course of dealing spanning almost six years wherein the parties worked jointly to market and develop the ProHeat line of products, but other than the allegation that the December 20, 2000, letter contained a fraudulent misrepresentation concerning the prospective nature of the relationship, Fitzpatrick provides no specificity about these allegedly ongoing fraudulent misrepresentations. At best the allegations support the notion that Teleflex breached one of the terms of an ongoing oral contract and attempted to terminate the relationship without good cause. This complaint simply does not plead fraud with the requisite specificity and this count should be dismissed.

### F.     Count VI—Unjust Enrichment

Teleflex argues that Fitzpatrick's claim for unjust enrichment must also be dismissed because Fitzpatrick has included a breach of contract claim with it. This argument has no legs.

To sustain his claim for unjust enrichment, Fitzpatrick must prove that he conferred a benefit on Teleflex; that Teleflex had appreciation or knowledge of the

benefit; and that the acceptance or retention of the benefit was under such circumstances as to make it inequitable for Teleflex to retain the benefit without payment of its value. Forrest Assocs. v. Passamaquoddy Tribe, 2000 ME 195, ¶ 14, 760 A.2d 1041, 1046. "Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship." A.F.A.B., Inc. v. Town of Old Orchard Beach, 639 A.2d 103, 105 n.3 (D. Me. 1994).

Even the most cursory overview of Fitzpatrick's complaint reveals sufficient factual allegations of benefits conferred upon Teleflex's with its knowledge under circumstances where retention of the benefit without just payment would be unjust. (See, e.g., Compl. ¶¶ 13, 28, 29, 31-37.) Perhaps recognizing the futility of this line of attack, Teleflex instead argues that Fitzpatrick cannot plead unjust enrichment because that claim would be inconsistent with his contract claims. However, Teleflex does not cite to a single case that stands for the proposition that a plaintiff is prohibited from pleading alternative theories of recovery. Consistent with Maine law, Fitzpatrick acknowledges that he cannot recover for unjust enrichment if he is able to enforce a valid contract. (Pl.'s Opposition at 14: "The fall-back is exactly Plaintiff's purpose for Count VI.") Fitzpatrick's position is entirely consistent with Maine law and practice. See Madore v. Kennebec Heights Country Club, 2007 ME 92, ¶ 4, 926 A.2d 1180, 1182 (noting with apparent approval the trial court's use of a jury form that instructed the jury to only consider the claim of unjust enrichment if they found no contractual liability.)

G.     Count VII—Recoupment

Fitzpatrick apparently concedes that "recoupment" is a misnomer and that this count should be relabeled as a claim of "restitution." Without citation to any authority

Fitzpatrick announces that "[r]estitution is the equitable version of unjust enrichment." (Pl.'s Opposition at 17.)  It appears to me that whether this count is called recoupment or restitution is irrelevant.  It is nothing more, and nothing less, than an equitable claim for unjust enrichment and, as such, is redundant of Count VI and should be dismissed.  See McTeague, Higbee, MacAdam, Case, Cohen & Whitney, P.A. v. MacAdam, CV-00-249, 2000 WL 33675348, *2 (Me. Super. 2000) (recognizing an unjust enrichment cause of action that seeks restitution and/or recoupment as remedies).

## Conclusion

Based upon the foregoing I recommend the Court grant the motion to dismiss as to Counts III, V, and VII and deny the motion as to Count I, Count II, Count IV, and Count VI.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 17, 2009