# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| GORDON FITZPATRICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:08-cv-00400-MJK |
| ) | |
| TELEFLEX, INC., *et al.*, ) | |
| ) | |
| Defendants ) | |

## MEMORANDUM OF DECISION[1]

Gordon Fitzpatrick claims that the Defendants, Teleflex, Inc., and Teleflex Canada, wrongfully terminated his distributorship/franchise. Mr. Fitzpatrick originally brought a seven-count complaint. The Court previously dismissed Counts III, V, and VII (breach of the implied duty of good faith and fair dealing, fraud, and recoupment). The parties then consented to allow me to conduct any and all proceedings, including the entry of final judgment. Now pending is the Defendants' motion for summary judgment on the four remaining counts (breach of contract, unfair trade practices, breach of fiduciary duty, and unjust enrichment). Fitzpatrick opposes the motion except with respect to his unjust enrichment claim, which he has elected to abandon. In addition, Fitzpatrick has filed a motion for partial summary judgment in his favor on Count II, alleging an unfair trade practice pursuant to the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S.A. §§ 1361 *et seq.*, made actionable under the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A *et seq.* Fitzpatrick's motion is denied. The Defendants' motion is granted in part and denied in part.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

**STATEMENT OF FACTS**

The following factual statement is drawn from the parties' statements of material facts submitted and construed in accordance with District of Maine Local Rule 56. The relevant documents are the Defendant's Statement of Undisputed Material Facts (Doc. No. 53), the Plaintiff's Statement of Undisputed Material Facts [sealed] with Redacted Version (Doc. Nos. 56 & 61), the Plaintiff's Opposing Statement of Material Facts (Doc. No. 71), and the Defendant's Response to Statement of Fact (Doc. No. 68). Neither party has filed a reply statement of facts.

Plaintiff Gordon Fitzpatrick is the owner of Gordie's Repair Shop, a truck service station located in Houlton, Maine. Defendants Teleflex, Inc., and Teleflex Canada, Inc., (collectively "Teleflex") are a multinational business association engaged in the manufacture and sale of a large number of products. Between roughly 1999 and 2009, the products they manufactured included the "ProHeat" auxiliary power unit ("APU").

An APU is a diesel generator that can be mounted to the exterior of a class A truck or bus and used as a heating or cooling system and also as an electrical supply for appliances. A truck with an APU attached can have a climate controlled cab and an electrical supply without having to idle the truck's engine for those purposes, thereby reducing fuel consumption. Teleflex manufactured and marketed the ProHeat APU from at least 1999 through 2009. During that period, the product underwent continuing development in the field. In 2009, Teleflex sold the product line to another manufacturer.

Teleflex recruited a variety of businesses to sell its APU, including independent service shops like Gordie's. Fitzpatrick contacted Teleflex because he had a customer interested in purchasing an APU. Fitzpatrick inquired how he could become a dealer for Teleflex. At the

time, the only prerequisites to become a ProHeat dealer were to have adequate technical skills and facilities and be successfully trained to install and service the ProHeat APU. Fitzpatrick d/b/a Gordie's Repair Shop met these qualifications. In November of 2000, the sales and marketing manager for Teleflex's APU line, Douglas Scott Winton, visited Gordie's Repair Shop with a Teleflex technician trainer and Fitzpatrick entered into a handshake deal to be a ProHeat dealer. An appointment letter dated December 20, 2000, later memorialized that an agreement had been reached and congratulated Gordie's Repair Shop for becoming a "ProHeat Center of Excellence." (Fitzpatrick Dep. Ex. 5, ECF Page ID # 916.) This relationship persisted into 2006, when Teleflex seized the opportunity to distribute its APUs through Carrier Corporation, a large and well established national distributor, and discontinued its relationship with many of its independent dealers, including Fitzpatrick.

*The Agreement*

The agreement between Teleflex and Mr. Fitzpatrick authorized Fitzpatrick to purchase and install ProHeat APUs for his customers; to advertise Gordie's Repair Shop as a ProHeat dealer and use related trademarks when doing so; and to perform and be compensated for warranty work. Teleflex agreed orally to provide marketing and technical support and Fitzpatrick agreed orally to promote the product in Maine and beyond, to the extent he could do so as a small operation in Houlton, Maine. The agreement did not impose any geographical limitation on the ability of Gordie's Repair Shop to market or sell the ProHeat APU.

ProHeat dealers earned money by buying the APU from Teleflex at wholesale and marking the price up for resale and by performing warranty and regular maintenance work on APUs. Other than paying the wholesale price for the APU, Teleflex did not obtain any money from its dealers, such as by assessing fees or requiring a dealer to "buy in" for the right to sell

APUs. After a dealer relationship was established, Teleflex uniformly sent to the dealer a form letter memorializing the oral agreement and a package of service manuals, technical material, marketing brochures, and similar start-up materials.

Mr. Winton was the primary representative of Teleflex responsible for communicating with Fitzgerald regarding the terms and conditions of his dealership. The parties dispute whether Winton explained to Fitzpatrick that the deal was a "handshake" arrangement that either party could walk away from at any time. Fitzpatrick says the issue was never discussed. Both agree that other than speaking in terms of a generic long-term (indefinite) relationship, no dealership term was ever discussed. Winton does not remember that Fitzpatrick insisted upon any other terms being included in the relationship other than the terms outlined above. Fitzpatrick maintains that he was promised, initially, an exclusive territory covering Maine and New Hampshire.

*Other Facts and Circumstances*

Teleflex did not restrict its dealers from selling competing products. As of 2005, some ProHeat dealers also sold APUs made by Thermo King, a leading competitor, even though they were also ProHeat Centers of Excellence.

ProHeat dealers did not pay into a common marketing fund. Teleflex did not require its dealers to spend money in certain ways or meet certain performance or sales benchmarks. Nor did Teleflex control the appearance of its dealers' shops or dictate inventory requirements.

Teleflex did not closely monitor Fitzpatrick's performance as a dealer. He was not obligated to sell or market ProHeat APUs in any particular fashion. Nor did he have performance benchmarks to meet. Teleflex did not impose monthly or annual sales quotas and did not perform monthly or annual performance reviews. Fitzpatrick did not have to submit

annual sales reports. Teleflex did not dictate the size of Fitzpatrick's staff or how many employees he needed to retain to promote, sell, or service its product. In essence, Teleflex had no control over the day-to-day operations of Fitzpatrick's business.

Fitzpatrick's evidentiary presentation does not demonstrate any significant monetary investment in ProHeat APUs or other financial entanglements with Teleflex. Rather, Fitzpatrick has testified that he expended a great deal of effort on behalf of the ProHeat products, allegedly to the detriment of his truck repair business and his personal life. In order to promote ProHeat APUs Fitzpatrick voluntarily undertook to post flyers and brochures at truck stops throughout New England, including with the aid of customers, family, and friends. Fitzpatrick incurred a $100.00 expenditure on drill bits in order to accommodate his APU installation and repair work, but Teleflex did not direct what tools or equipment Fitzpatrick kept on-site at his repair shop. Upon the cessation of the dealer relationship, Gordie's Repair Shop did not have a ProHeat APU in its inventory.

The Maine market was a small niche in the Teleflex network and did not account for many sales, comparatively speaking. Winton and Fitzpatrick dispute whether Teleflex ever had plans to carve various geographic regions up into territories and whether Fitzpatrick was ever granted the exclusive rights to a geographic region. Mr. Fitzpatrick's wife, Suzanne Fitzpatrick, believes that Allen Smith, Teleflex's national sales manager, once sent Gordon an e-mail indicating that he was the exclusive Teleflex dealer for all of New England. This e-mail has never been produced. Nor has any other document that describes an "exclusive" right to profit from sales or to distribute APU units or parts connected with sales or service occurring within a defined territory. It appears from the record that Teleflex likely encouraged Fitzpatrick to promote the ProHeat APU throughout Maine and New Hampshire.

Mr. Fitzpatrick maintains that his right to market and sell ProHeat APUs was a franchise entitled to special protection under the Maine law. From his perspective, his business was used by Teleflex to help introduce its ProHeat APUs to the market, but then "victimized and destroyed" or, "in a manner of speaking, . . . lined up . . . and shot them between the eyes" when an established nation distributor came to call. (Pl.'s Mot. at 3, 16-17, Doc. No. 55.) The facts on which this rhetoric is based are as follows.

In and after 1999, Teleflex knew that it would be unable to attract a single large distributor to market ProHeat APUs because the product line was still developing and had problems with reliability in use. Teleflex realized that before it could enter into a national distributorship agreement with an established national distributor it would have to reach a certain critical mass in terms of number of units sold. When the product line began in 1999, this was a distant prospect. The ultimate distribution plan would be a function of how the business evolved over time and Teleflex wanted to maintain flexibility in terms of its relationship with its network of independent dealers.

The model of the ProHeat APU manufactured by Teleflex in 1999 was designated as the ProHeat Gen 3, the third model developed. This model and the next, the Gen 4, had a variety of performance issues. Over time, Teleflex improved on the design by increasing its performance capacity, narrowing its profile, reducing its noise level, improving its electronics, and manufacturing a more durable housing. In the summer of 2006, Teleflex introduced the ProHeat APU Gen 5, which incorporated these improvements.

Teleflex had an interest in the improvement of the ProHeat product and in marketing efforts designed to promote the product. Its dealers were also interested in realizing the benefit of marketing activity and in having an improved product to sell. Over the course of his

relationship with Teleflex, Fitzpatrick, like other dealers, had many conversations with Teleflex representatives related to APU technical issues. Fitzpatrick asserts that his observations and opinions about product issues were of benefit to Teleflex. The record reflects that the ProHeat Gen 4 model was experiencing improved sales, as compared to the Gen 3, but that a number of performance issues were arising. Teleflex's conversations with dealers about these problems and associated warranty work gradually led to improvements in design and build. Among the dealers reporting such problems was Fitzpatrick. However, Fitzpatrick denied ever having a discussion with Winton suggesting that Fitzpatrick would be compensated for any design ideas he shared to improve the product.[2]

From 2000 to 2003, Teleflex sold an average of 500 APUs per year in North America. In 2004, Teleflex sold approximately 1100 units. In 2005, sales climbed to between 3000 and 4000 units. In 2006, after Carrier Corporation was appointed the exclusive distributor, Teleflex sales approached 9000 units. Four or five Teleflex dealers made the bulk of the APU sales in any given year. The most robust geographic areas for those sales were in the Midwest and Southwest regions of the United States and in northeastern Canada. As for Fitzpatrick, he sold two units in 2000, eight in 2001, one in 2002, four in 2003, thirteen in 2004, thirteen in 2005, and three in the first two months of 2006.

---

[2] There is a reasonable inference supported by the record that Fitzpatrick's technical and mechanical skills enabled him to relay problems to Teleflex representatives, such as was testified to by Anthony Van Grol at his deposition, and that Fitzpatrick's know-how may have supplied him with solutions to troubleshooting APU issues in the field. Fitzpatrick's personal contribution to any specific product improvement cannot be determined on this record, but, as a whole, feedback from the network of ProHeat dealers, including through warranty claim paperwork, identified opportunities for improving design and build quality. (See, *e.g.*, Dec. 6, 2005, Rhonda Elton Letter, ECF Page ID # 967.) I do not relate every fact associated with product development, however, because Fitzpatrick has abandoned his unjust enrichment theory and these facts do not support his breach of contract claim given the undisputed fact that the parties' agreement did not involve any promise to compensate Fitzpatrick for design ideas. Although facts related to this collaborative effort at product improvement would be relevant to the community of interest dispute associated with Count II, the franchise claim, that claim is time barred for reasons explained in the discussion.

7

In January 2006, Teleflex began negotiations with Carrier Corporation that culminated in an agreement for Carrier to distribute ProHeat APUs through its nationwide dealer network. Also in that month, Fitzpatrick learned that a Bangor, Maine dealership was selling and servicing ProHeat APUs. Fitzpatrick sent a letter to Teleflex complaining of his discovery and asserting that it had been his understanding that he was supposed to be "the dealer" for the State of Maine and that he was entitled to some profit in connection with all Maine-based sales. (Fitzpatrick Dep. Ex. 6, ECF Page ID # 1062.) Future discussions with Teleflex representatives did not achieve any recompense for Fitzpatrick. Teleflex did not end its relationship with the Bangor dealer. Nor did it provide Fitzpatrick with any commission on the new dealer's sales.

*Termination of the Relationship*

A June 13, 2006, letter from Teleflex to Gordie's Repair Shop notified Fitzpatrick that the relationship was over and assigned a "termination date" of 90 days from the date of the letter. Teleflex promised to honor "all current open purchase orders" and warranty claims for warranty service provided within the 90-day termination period. (Smith Dep. Ex. 9, ECF Page ID # 955.) However, prior to receipt of the termination notice, Fitzpatrick had attempted to place an order in March 2006. Allen Smith told Fitzpatrick at that time that Teleflex would not sell him any more APUs and that Carrier had the exclusive right to sell the APUs under a new trademark. Smith told Fitzpatrick that Teleflex would still sell him parts for service calls and pay him for any warranty work for a period of time. Fitzpatrick attests to performing some warranty work in this window. He also testified that he suffered a loss as of March 2006, when he called to order one APU, and that he lost three additional sales opportunities in an unspecified timeframe following the March order. (G. Fitzpatrick Dep. at 275-76.)

The distribution agreement between Teleflex and Carrier indicated that some independent dealers of Teleflex products (those identified on a schedule attached to the agreement) would have an opportunity to apply to join Carrier's network of dealers, and could become Carrier dealers subject to Carrier's approval. Fitzpatrick did not become a Carrier dealer. It is not clear whether Gordie's Repair Shop was included on the schedule of independent dealers supplied to Carrier. The schedule is not cited in the parties' statements. It appears that Teleflex disclosed Gordie's as one of its independent dealers. In any event, according to his deposition testimony, Fitzpatrick was not interested in joining the Carrier network.

## DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merch. Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Mr. Fitzpatrick's complaint recites seven counts. The Court has previously dismissed three counts: three, five, and seven, representing claims for breach of the implied duty of good faith and fair dealing, fraud, and recoupment, respectively. Teleflex's motion for summary judgment challenges the four remaining counts: breach of contract, unfair trade practices, breach

of fiduciary duty, and unjust enrichment. In his summary judgment opposition brief, Fitzpatrick indicated he would file a motion to dismiss his unjust enrichment claim pursuant to Rule 41, voluntarily, effectively abandoning that claim at summary judgment. Because he has not filed the motion to dismiss, I will enter judgment against it in this memorandum of decision, as a conceded claim. The remaining three claims are discussed below, in reverse order. Given the state of the record, Teleflex is entitled to judgment as a matter of law on the fiduciary duty claim (Count IV) and the franchise claim (Count II). A genuine issue of disputed fact exists on the breach of contract claim (Count I) because the record does not preclude a limited contract recovery.

**A.   Fiduciary Duty**

Mr. Fitzpatrick alleges that Teleflex breached a fiduciary duty it owed to him by virtue of their respective levels of sophistication in relation to negotiation and sales skills. (Compl., Count IV.) Teleflex argues that the parties' relationship was an ordinary arm's-length business relationship and that there is no basis in the record to impose fiduciary duties. (Def.'s Mot. at 16-17.) Teleflex's position is supported by the undisputed record. Fitzpatrick's fiduciary duty theory is not.

"The question of whether one party owes a fiduciary or other duty of due care to another is a question of law." Fortin v. Roman Catholic Bishop of Portland, 2005 ME 57, ¶ 35, 871 A.2d 1208, 1220. What is needed to demonstrate the required relationship is evidence that one party placed its trust and confidence in the other and that there was a great disparity of position and influence favoring the one in whom the trust was placed. Camden Nat'l Bank v. Crest Constr., Inc., 2008 ME 113, ¶ 13, 952 A.2d 213, 217. The Law Court has held that the mere existence of a creditor-debtor relationship or a mortgagor-mortgagee relationship will not establish the

10

existence of a confidential or fiduciary relationship. Id., 2008 ME 113, ¶ 15; Stewart v. Machias Sav. Bank, 2000 ME 207, ¶ 11, 762 A.2d 44, 46. By extension, it is plain that the relationship of a manufacturer to a dealer is not inherently a fiduciary or confidential relationship. What is required is additional evidence related to the actual placement of an uncommon trust in another that creates not only a disparity of position or influence, but a "great disparity"; the kind of disparity that arises from "diminished emotional or physical capacity or . . . the letting down of all guards and bars." Id., 2000 ME 207, ¶¶ 10-11.

The record in this case demonstrates great enthusiasm and excitement on Fitzpatrick's part about both the product and the relationship with Teleflex, prior to the end, but it simply does not demonstrate a great disparity of position or influence, let alone evidence of diminished capacity or the letting down of all guards and bars. Teleflex is entitled to judgment in its favor, as a matter of law, on Count IV.

**B.     Franchise Protection and Unfair Trade Practices**

According to Mr. Fitzpatrick, it was an unfair trade practice for Teleflex to terminate its dealer relationship with him because the agreement that he could market, promote and sell ProHeat APUs and perform manufacturer-reimbursed warranty service amounted to a franchise under the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361 *et seq.*, a practice made actionable by the Maine Unfair Trade Practices Act, 5 M.R.S. §§ 205-A *et seq.* (Compl., Count II.) In its motion, Teleflex contends that it is entitled to judgment against this claim because the statute of limitation expired before Fitzpatrick filed suit and because the relationship did not involve a "community of interest" and, therefore, was not a franchise entitled to special protection under Maine law. (Def.'s Mot. at 4, 6.)

Chapter 211-A of Title 10, Maine Revised Statutes, codifies Franchise Laws for Power Equipment, Machinery and Appliances. The Franchise Laws prohibit manufacturers from engaging in certain "unfair methods of competition and unfair and deceptive practices" in respect to a "franchise relationship." 10 M.R.S. § 1363. Among other prohibitions, the Franchise Laws declare that it is unfair and deceptive "to terminate, fail to renew or refuse to continue any franchise relationship with a distributor or dealer, . . . without good cause." Id. § 1363(3)(C). Acceptable grounds for termination of a franchise are specifically enumerated in the Franchise Laws and include failure of a dealer to comply with a reasonable and material provision of a franchise agreement, mutual agreement to discontinue the franchise, and discontinuance of production or distribution by the manufacturer. Id. "Good faith" and "good cause" inform the reasonableness and materiality inquiries. Id. § 1363(3)(B).

A violation of the Franchise Laws constitutes an unfair trade practice and is actionable under the Maine Unfair Trade Practices Act, Title 5, chapter 10. Id. § 1370. However, the Franchise Laws impose a two-year period of limitations on such actions rather than the six-year period otherwise imposed on claims arising under the Unfair Trade Practices Act. Id. § 1369. See also McKinnon v. Honeywell Int'l, Inc., 2009 ME 69, ¶ 10, 977 A.2d 420, 424 (applying six-year limitation period of 14 M.R.S. § 752 to UTPA claim). More specifically, pursuant to the Franchise Laws: "Actions arising out of any provision of this chapter must be commenced within 2 years after the cause of action accrues . . ." 10 M.R.S. § 1369.

### 1. *Fitzpatrick's claims are time barred.*

The Franchise Laws commence the limitation clock upon the date a dealer's claim accrues. The Maine Supreme Judicial Court pegs the time of claim accrual at "the time the plaintiff sustains a judicially cognizable injury." Chiapetta v. Clark Assocs., 521 A.2d 697, 699

(Me. 1987). "Usually a cause of action sounding in contract accrues when the contract was breached and a cause of action sounding in tort accrues when the plaintiff sustains harm to a protected interest." Id. (citation omitted). Teleflex argues that, assuming Fitzpatrick's relationship with Teleflex qualifies for protection under the Franchise Laws, he sustained a judicially cognizable injury in March 2006, when Teleflex informed him that Carrier was the new distributor and refused to sell an APU directly to him. Alternatively, Teleflex argues that the latest possible accrual date would be in August 2006, when Fitzpatrick received the written termination notice. (Def.'s Mot. at 4-5 & n.1.) According to Teleflex, if the Franchise Laws applied to the parties' relationship, Fitzpatrick would have been entitled to pursue legal remedies as of the date he first received notice that Teleflex would no longer honor the preexisting dealer agreement. This interpretation is sound.

Fitzpatrick says that it is now law of the case that his action is not time barred because the Court previously denied Teleflex's motion to dismiss on this same legal ground. (Pl.'s Opp'n at 3.) However, at the dismissal stage, the Court's evaluation of the matter focused on a complaint that presented a narrow picture involving a June 13, 2006, termination letter setting a dealership termination date 90 days out. In this regard, the complaint alleges as follows: "On June 13, 2006, Teleflex-Canada and the Power Systems Division of Teleflex sent to Plaintiff a written notice of termination on September 11, 2006, of all agreements relating to purchase, supply, sales, servicing and/or distribution of APUs . . ." (Compl. ¶ 44.) In contrast, the summary judgment record now reflects that Teleflex stopped selling APUs to Fitzpatrick in March 2006 and that Fitzpatrick claims he lost a sale as of that date. Without question, Fitzpatrick was injured in fact more than two years prior to the commencement of litigation. Moreover, that

injury involved the most important stick in the bundle of rights he had as a dealer: the right to sell APUs to customers.

"Law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Law of the case directs a court's discretion, it does not limit the tribunal's power." Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)). Moreover, the doctrine does not strictly apply to interlocutory orders. "Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994) (holding that trial court was free to enter an order dismissing claims as time barred after prior ruling to the contrary).

Given the picture developed in the course of discovery and presented to the Court in both parties' summary judgment statements, Fitzpatrick's claim under the Franchise Laws is time barred. Mr. Fitzpatrick contests this outcome on the ground that a mere refusal to perform under the agreement is not "sufficiently positive until the effective termination date," because a contrary approach to the issue "would defeat the protections provided by statute for the terminated dealer." (Pl.'s Opp'n at 4.) This argument is not persuasive. Fitzpatrick understood that he could no longer obtain APUs from Teleflex to fill orders from customers and he lost, according to his deposition testimony, at least one sale in March 2006. Even if some question existed regarding Smith's authority to deny sales on behalf of Teleflex, the June letter cemented the oral notice Fitzpatrick received in March. The existence of a concrete injury in fact as of his receipt of the June 2006 letter dispels the notion that Fitzpatrick's claim for breach of the Franchise Laws had not accrued prior to September 2006. There is no sound legal basis for

pretending that a judicially cognizable injury was not manifest until Teleflex had also taken away the right to perform warranty service at the close of the 90-day window stated in the June written notice. Statutes of limitation always defeat otherwise available protections. Fitzpatrick fails to offer any sound reason why the statute of limitation found in the Franchise Laws should work any differently than others.[3] Teleflex is entitled to judgment as a matter of law on Count II because the claim was time barred by the time Fitzpatrick commenced his action.

### *2. Community of interest under Maine law.*

Teleflex maintains that Fitzpatrick did not have a franchise under the Franchise Laws, in any event, because there was no "community of interest" between the parties. The Franchise Laws define a franchise as an arrangement between a manufacturer and a dealer or distributor that involves a "community of interest in the marketing of goods and related services." 10 M.R.S. § 1361(3.) There is no Maine decisional law construing what the Maine Legislature meant by the "community of interest" concept, which appears not only in the Franchise Laws at issue in this case, but also in statutory provisions governing business practices between motor vehicle manufacturers and their dealers and distributors. Assuming that the Maine Supreme Judicial Court would follow persuasive precedent from other jurisdictions that have been called upon to interpret this language, it is quite possible that it would hold that Fitzpatrick's ProHeat dealership is not protected by the Franchise Laws, as a matter of law, due to his very limited financial investment in the franchise (described primarily as "sweat equity"), the relatively short

---

[3] Fitzpatrick also suggests that the Franchise Laws require a 180-day notice and that no notice can commence the limitation period unless it is sent by registered, certified or other receipted mail. (Pl.'s Opp'n at 4.) The Franchise Laws do not require that notices of termination ensure 180-day continuances of the status quo. Rather, they require that a manufacturer not premise a termination decision on an issue that is more than 180 days stale. 10 M.R.S. § 1363(3)(C)(1). The Franchise Laws do required that notices of termination or nonrenewal be sent by receipted mail, telegram or personal delivery. Id. § 1366. However, they do not tie this requirement to the statute of limitation, which specifies that the limitation period commences upon accrual. There simply is no legal basis to find that a known material breach or violation will not start the clock running until such time as formal written notice has arrived by receipted mail, telegram, or personal service.

15

duration of the relationship, the absence of any financial entanglement with Teleflex, the absence of any financial dependence on Teleflex's continued patronage to meet dealership-related liabilities, and the absence of any demands placed on Fitzpatrick's operations and performance by Teleflex, notwithstanding countervailing factors such as Fitzpatrick's advertising activity, performance of warranty service on Teleflex's product, and investment of time troubleshooting APU performance issues. See, e.g., Ziegler Co., Inc. v. Rexnord, Inc., 407 N.W.2d 873 (Wis. 1987); Engines, Inc. v. MAN Engines & Components, Inc., Civ. No. 10-277 (RMB/KMW), 2010 U.S. Dist. Lexis 76541, 2010 WL 3021871 (D. N.J. July 29, 2010) (slip opinion on mot. for prelim. inj.). However, given the disposition on the statute of limitation question, it is not necessary to reach the issue of whether Fitzpatrick's relationship with Teleflex demonstrates a "community of interest" under Maine law.

**C.     Breach of Contract**

Fitzpatrick's complaint includes a common law breach of contract claim. (Compl., Count I.) Teleflex argues that this claim cannot succeed without the protective overlay of the Franchise Laws because the agreement was for an indefinite term and was terminable at the will of either party. (Def.'s Mot. at 12-13.) In opposition, Fitzpatrick argues that there is a genuine issue of fact whether the parties intended to have a "long-term" contract. (Pl.'s Opp'n at 2.) The summary judgment record does not generate a genuine issue of material fact on the issue of contract duration. Rather, it demonstrates conclusively that the parties never assigned any durational term to their business relationship and anticipated that it would last an indefinite period.

In general, the law will supply a reasonable term when there is a contract that omits a term essential to the determination of the parties' rights and responsibilities. Restatement

(Second) of Contracts § 204. Teleflex says that a durational term is different and that, as a matter of law, all indefinite contracts are terminable at the will of either party. This is an accurate statement of the law, as far as the decision to terminate is concerned. However, while Teleflex was free to terminate the relationship "at will," the law also requires reasonable notification. See Bangor & Aroostook R. Co. v. Daigle, 607 A.2d 533, 535 (Me. 1992) ("Courts, while recognizing a right to terminate at will, have limited that right by requiring that a contract remain in effect for a reasonable period of time and reasonable notice be given."); Agway, Inc. v. Ernst, 394 A.2d 774, 779 (Me. 1978) (addressing requirement of notice concerning price change in an oral contract involving successive orders for agricultural feed); see also 11 M.R.S. § 2-309(3) ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party . . .") & cmt. 8 ("[T]he application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.")[4] It is undisputed in this case that Teleflex denied Fitzpatrick at least one sale prior to giving him any advance notice of termination.[5] This undisputed fact precludes entry of summary judgment for Teleflex.

The summary judgment papers are not drawn up in a manner that facilitates a discussion of the exact scope of the remaining contract claim. Teleflex has taken the position that a right to terminate the agreement at will would foreclose any and all recovery on a contract theory.

---

[4] The Second Restatement of Contracts, section 204, comment d, states that when it comes to supplying an omitted term, "the court should supply a term which comports with community standards of fairness and policy"). Section 33 of the Restatement is somewhat equivocal on the issue of notice of termination, likely because of variation among the many jurisdictions considered. See Restatement (Second) of Contracts § 33 illus. d. ("When the contract calls for successive performances but is indefinite in duration, it is commonly terminable by either party, with or without a requirement of reasonable notice.").

[5] This contract claim accrued at the same time as the franchise claim. However, it is subject to the six-year statute of limitation, 14 M.R.S. § 752, rather than the franchise-specific, two-year statute of limitation.

Fitzpatrick's opposition memorandum is very limited in terms of the contract claim. In effect, Fitzpatrick simply disputes that termination could be imposed on an at-will basis. Fitzpatrick does not even suggest that a reasonable notice requirement could be imposed even in the event of an at-will termination scenario. Nevertheless, the law calls for reasonable notice and it is undisputed that at least one order was denied without any advance notice of termination. It remains to be seen whether Fitzpatrick's contract claim can gather up additional lost orders beyond the March 2006 order that Teleflex refused to fill. I have in mind here Fitzpatrick's deposition testimony about losing four orders, though that testimony did not provide any details. As for Fitzpatrick's theory that he suffered damages associated with APU sales made by other Maine dealers, Fitzpatrick fails to generate a genuine issue of material fact that there was ever a mutual agreement that he would serve Teleflex as a regional distributor with rights in sales and warranty service performed by any and all other distributors, dealers, or vendors in the entire State of Maine (or New Hampshire). Rather, the undisputed facts present a mutual understanding and agreement that Fitzpatrick would be an independent distributor/dealer free to promote and sell APUs without any geographic restriction. It is one thing to read a reasonable notice term into the dealership agreement based on established common law. It is quite another to graft on exclusive, territorial rights in third-party retail sales that are not required by law, are not corroborated by any written document in the record, and were never observed in the course of the parties' multi-year commercial relationship.[6]

---

[6] It is worth noting that a 90-day notice would certainly be reasonable. Here, however, the 90-day notice period only allowed for preexisting orders and additional warranty work. There was no notice period communicated to Fitzpatrick that would have allowed for any additional APU sales. What a reasonable timeframe would be for foreclosing all additional sales, and whether that presents a question of law or a question of fact, are issues that will have to be addressed at a later juncture, with the benefit of input from the parties.

**D. Motion to Exclude Testimony**

Teleflex has filed a motion requesting that Glenn Kersteen, Fitzpatrick's damages expert, be precluded from testifying at trial because (1) he misrepresented himself as a licensed CPA and (2) because his projection of future economic damages is speculative. (Mot. to Exclude, Doc. No. 54.) Because the summary judgment disposition forecloses a recovery based on any extended projection, Kersteen's damages opinion is no longer in line with the actual nature and scope of the case. His opinion will need to be substantially reworked, should he continue as a retained expert in this case. As for the remaining challenge, according to Teleflex, Kersteen has committed a "fraud" because he is not actually a CPA, contrary to what is indicated in his expert report and curriculum vitae, and in Fitzpatrick's expert designation. (Id. at 5.) The relevant exhibit is a decision by the Maine Board of Accountancy, which sanctioned Kersteen for failure to fulfill continuing education requirements connected with his license, circa 2007; a license he first obtained in 1977. It is ironic that the Court is being asked to rule that someone with roughly 30 years of CPA experience not be allowed to testify as an accounting expert. Clearly Kersteen qualifies as an accounting expert even though his license to practice has/had expired. If Kersteen testifies the factfinders will be allowed to hear about Kersteen's difficulties with the licensing authority and that in spite of his license being suspended, he described himself as a CPA. A factfinder might well decide to give his opinion little weight in light of his professional difficulties, or not. The motion is DENIED.

### CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. No. 52) is DENIED as to Count I, but GRANTED as to Counts II, IV, and VI. Plaintiff's Motion for

Partial Summary Judgment on Count II (Doc. No. 55) is DENIED.  Defendant's Motion to

Exclude (Doc. No. 54) is DENIED.

*So Ordered.*

February 7, 2011                    /s/ Margaret J. Kravchuk
                                    U.S. Magistrate Judge